## JACQUE v. LOCKE INSULATOR CORPORATION.

### No. 68.

Circuit Court of Appeals, Second Circuit.
April 30, 1934.

John D. Sullivan, of Rochester, N. Y. (John F. Thomas and Francis C. Wickes, both of Rochester, N. Y., of counsel), for defendant-appellant.

William L. Clay, of Rochester, N. Y., for plaintiff-appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This action was by the administratrix of Joseph A. Jacque to recover damages from the defendant, a corporation engaged in the manufacture of insulator equipment at Victor, N. Y., for negligence in failing to provide her deceased husband with a safe place to work whereby he contracted silicosis, which was a contributing cause of his death. The amended complaint alleged that the defendant was negligent in permitting silicate dust to come into close proximity with the decedent and in failing to furnish him with necessary safety apparatus in connection with his work so as to prevent the entry of particles of silica and sand in the respiratory tract and lungs, whereby he contracted silicosis and disease and thereafter died as a result of the same. It also alleged that the defendant failed to comply with the requirements of the Labor Law of the state of New York (Consol. Laws, c. 31) which had to do with ventilation and dust removal and dust protection, particularly the provisions of section 299, which requires the employer to provide: (a) Sufficient means of ventilation; (b) a proper exhaust system to remove the silica from contact with the employees; (c) to provide protective equipment such as respirators to be used by the employees while at work whenever the atmosphere is polluted with poisonous dust.

The principal defense asserted on this appeal is that the death of Jacque was not proximately caused by the fault of the defendant.

The defendant, Locke Insulator Corporation, was engaged in the manufacture of

porcelain insulators which are made of a mixture of

Feldspar .................32.36 per cent.
Flint ....................21.59 per cent.
China clay................19.65 per cent.
Ball clay.................26.38 per cent.

A total of materials........99.98 per cent.

Jacque was a workman at defendant's plant who operated a series of machines consisting of three ball mills that were on the ground floor and were loaded from a chute descending from the second floor. The upper part of this chute was made of wood, the central portion of canvas, and the lower portion, which entered the ball mill, of steel. The interposition of the canvas between the two ends of the chute enabled it to be moved up and down so that the steel end could be hooked to the ceiling when it was not in use. The steel end entered an opening in the ball mill in which the flint, feldspar, and clay were ground by the rotation of the stones of the mill in order to make the porcelain. The ingredients were piled on the floor above the mill. When it was ready to be charged, Jacque unhooked the steel end of the chute from the ceiling and inserted it in the aperture in the mill. Upon a signal from him to the man on the next floor, the latter would pull a chain that opened an iron plate or trap on that floor and thus dump the feldspar, flint, and clay through the trap and down the chute into the ball mill. According to the plaintiff's testimony there was an opening around the chute at the place where it entered the mill due to a loose fitting joint, and through this opening dust from the powdered flint was emitted as the load was discharged into the mill. While defendant's foreman testified that the chute fitted tightly, he admitted that there were spaces between the chute and the edge of the aperture through which dust came almost every time the mill was charged. There were three mills which Jacque operated on the ground floor of the factory, and when it was in full operation they were charged four times a day. The plaintiff's witness Birkett testified that, when a load was dumped, the dust would spread all through the room where Jacque was working. There was likewise testimony that the floor of the room above was old and defective and that dust from the powdered flint piled in that room would come down through holes. Moreover, there was testimony that dust would not only be disseminated when the trap in the floor was opened and the contents descended, but that about 40 per cent.

of the load remaining would have to be shoveled in, so that still more dust would then escape. Birkett testified that there was thick dust all about where Jacque worked and upon his person as well. While there doubtless was exaggeration as to the extent of the silica dust and both Birkett and Forte, who supplied the evidence as to its diffusion in the mill, were biased and hostile witnesses, there was sufficient evidence for a jury to find that the chute did not fit tightly at the point where it entered the apertures in the ball mills and that silica dust came through these spaces and at times through openings in the floor above.

The defendant took no steps to prevent the diffusion of the silica dust in the room where Jacque worked and did not furnish him with a respirator or give him any instructions as to the danger of poison from this extraneous substance, or as to how to avoid taking it into his lungs. It is undisputed that no exhaust system was installed in the factory to carry away the dust so that the workmen would not breathe it in, and the testimony that such an exhaust system was practicable, though perhaps not very convincing, was sufficient to go to the jury. Moreover, whether an exhaust system was practicable or not, we can have no doubt that the ceiling could and should have been made tight so that no silica dust would come through from the floor above and that any space between the chute and the edges of the openings in the ball mills should have been eliminated or made entirely impervious to the passage of dust.

We think that the verdict sufficiently established that silica dust escaped into the room and Jacque inhaled it because the defendant (a) neglected to install a proper exhaust system as required by section 299, subdivisions 2 and 3 of the Labor Law of the state of New York; (b) neglected to prevent the escape of such dust by other means; and (c) neglected to supply Jacque with a respirator and to instruct him about the danger of contracting silicosis and how to avoid it.

The question remains whether Jacque received physical injuries from the silica dust and, if so, whether they caused, or contributed to, his death. There was evidence that Jacque inhaled a substantial amount of this dust. He had been working on the same floor in defendant's factory for about seven years and had been engaged in operating the ball mills for four years. The autopsy disclosed that his lung tissue consisted of silicon dioxide to the extent of 2.2 per cent. There seems to be little doubt that an im-

pregnation of the lungs by silica decreases their capacity to permit the passage of blood pumped through them from the heart. There was testimony that the silica particles are insoluble and therefore, when once inhaled, become permanently imbedded in the lungs and that, when silicosis reaches an advanced stage with consequent areas of density in the lungs and fibrosis it impairs breathing and brings pressure on the heart and produces coughing.

It was proved by indisputable evidence that Jacque had an aneurysm of the aorta which had become as large as an orange. This aneurysm was ruptured by some cause and, as a result, his blood, as it was pumped into the aorta by the heart, went right into the œsophagus and thence down into the stomach and caused death. Such a rupture might arise from almost any sharp jar or pressure. The origin of the aneurysm here, as is often the case, was syphilitic. It had pushed the trachea to one side, and thus displaced and probably somewhat contracted that organ. As a result, there would be difficulty in breathing and there would be coughing. In addition to the foregoing disabilities, there was evidence that Jacque had tuberculosis of the lungs and that this tuberculosis, the seeds of which are to some extent present in almost every one, might either have been set up or activated by particles of silicate dust embedded in the lungs which caused local irritation. An ordinary symptom of tuberculosis of the lungs is coughing.

There was also testimony that there was an abnormal pressure caused by an increased strain on the blood vessels from the reduction of the breathing area of the lungs through their impregnation with silicates which was likely to result in the perforation of the aneurysm. Dr. McCann, a very experienced physican called by the defendant, differed with this, and said that the strain caused by fibrosis of the lungs would be on the pulmonary artery and would not, in his opinion, bring added pressure on the aorta. But there was, outside of the testimony of Dr. McCann and Dr. Winslow (defendant's experts), a concensus in the great array of medical testimony that silicosis contributed to the death of Jacque.

Now we have the testimony of various physicians based on the X-ray pictures, the autopsy, and their scientific knowledge that Jacque had contracted silicosis and that it had progressed to the third stage. We also have evidence that silicosis at this stage results in coughing which is at times violent. There is also evidence that coughing is a

symptom both of an aortic aneurysm, a displaced trachea, and tuberculosis of the lungs, and that pressure on an aneurysm of the aorta caused by coughing is likely to burst it, and that a strain on the blood vessels is caused by the struggle of the heart to pump the blood through lungs, the effective area of which becomes reduced by the presence of silicon dioxide. The jury listened to this testimony that all these things tend to bring a strain upon an aneurysm that is likely to disrupt it. Mrs. Jacque testified that her husband was subject to severe spells of spasmodic coughing many times a day and it is conceded that the bursting of the aneurysm and the hemorrhage which followed immediately resulted in his death.

Under such circumstances, it does not seem reasonable to hold as a matter of law that a jury could not find that silicosis was a factor contributing to the fatal end. It is perfectly true that syphilis caused the aneurysm and that the duration of Jacque's life would have been short in any case. But we think there was proof that death was accelerated by silicosis.

Where there is evidence showing violent coughing that will arise from an aneurysm, a displaced trachea, tubercular lungs, and silicosis, it seems an unreasonable refinement of reasoning to say that the verdict must be for the defendant because it cannot be demonstrated how far each cough may be due to one or the other of these conditions. On the contrary, it seems to us possible for a jury to find that each factor irritated the lungs and all co-operated to strain the aneurysm to the bursting point.

The most difficult question is whether the extent of the impregnation of silica was sufficient to aggravate coughing spells that would in any event arise from the displaced trachea and the tubercular condition. But there was evidence which a jury might credit that the silicosis had reached such a stage as to produce severe coughing, and no better explanation of the final disruption is apparent than that it was a result of severe coughing and blood pressure from fibrosis of the lungs and that silicosis contributed to both of these things.

In Pennsylvania R. Co. v. Nelson (C. C. A.) 259 F. 156, recovery was denied because it could not be discovered which of two causes occasioned the death of the decedent, and the defendant was in no way responsible if it was due to one of them. Such a decision, therefore, is not in point here. The case at bar more nearly involves the situations dealt

with in McCahill v. New York Transportation Co., 201 N. Y. 221, 94 N. E. 616, 48 L. R. A. (N. S.) 131, Ann. Cas. 1912A, 961; Tice v. Munn, 94 N. Y. 621; Lang v. Stadium Purchasing Corp., 216 App. Div. 558, 215 N. Y. S. 502; and Clover, Clayton & Co., Ltd. v. Hughes, [1910] A. C. 242. The last of these decisions related to the case of a workman who had died from the rupture of an aneurysm that occurred when he was tightening a nut with a wrench. There was a finding by the court below that the aneurysm was "in such an advanced condition that it might have burst while the man was asleep, and very slight exertion or strain would have been sufficient to bring about a rupture." Under such circumstances, the House of Lords held that the strain, though one that might ordinarily be experienced in the course of the workman's employment, was sufficient to rupture the aneurysm and was the cause of his death and sustained a recovery under the British Workmen's Compensation Acts.

In Pennsylvania Pulverizing Co. v. Butler (C. C. A.) 61 F.(2d) 311, the cause of action was to recover damages from silica dust inhaled in the defendant's plant. The factory, was equipped with a dust-collecting and ventilating system, the men were furnished with respirators, and no legislation like section 299 of the New York Labor Law was relied on. The Circuit Court of Appeals of the Third Circuit held on the record before them that a verdict should have been directed for the defendant.

■ In the case at bar, section 299 of the Labor Law furnished a standard of care for the elimination of dust and warned the defendant of the necessity of taking means sufficient to prevent the diffusion of silica dust through the air of the room in which its employees worked. Moreover, in First National Bank of Ottawa v. Wedron Silica Co., 351 Ill. 560, 184 N. E. 897, and Madison v. Wedron Silica Co., 352 Ill. 60, 184 N. E. 901, the Supreme Court of Illinois sustained a recovery for injuries to workmen from silica dust where the employer had failed to install effective apparatus to protect its employees. Irrespective, however, of any statute, there is a duty at common law to warn and instruct employees and furnish them with means to avoid inhaling elements that are poisonous or injurious to their health, and there was proof that silica dust is such an element. Zajkowski v. American Steel & Wire Co. (C. C. A.) 258 F. 9, 6 A. L. R. 348; Thompson v. United Laboratories Co., 221 Mass. 276, 108 N. E. 1042. In a case like the present the damage was not occasioned by disease inherent in the occupation but because of neglect to furnish proper instruction and equipment for the prevention of any damage by silica dust.

■ It is contended that the verdict was too large, and, where any shortening of Jacque's life because of silicosis must have been slight, perhaps the trial court ought to have reduced it, but this court cannot review the subject of excessive damages where there was no error in the admission of testimony or in the charge. Ford Motor Co. v. Hotel Woodward Co. (C. C. A.) 271 F. 625, 630.

Other assignments of error require no special mention except to say that we find them without merit.

Judgment affirmed.